# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**ROBERT C. ASAY, JR.,**

      **Plaintiff,**

-vs-             **Case No.  6:05-cv-1260-Orl-KRS**

**COMMISSIONER OF SOCIAL
SECURITY,**

      **Defendant.**

_____

### ORDER

   This cause came on for consideration without oral argument on the Complaint filed by

Robert C. Asay, Jr., seeking review of the final decision of the Commissioner of Social Security

denying his claim for social security disability benefits.  Doc. No. 1.  The Commissioner answered

the Complaint and filed a certified copy of the transcript of the proceedings before the Social

Security Administration.  Doc. Nos. 9-10.  This matter has been referred to me for disposition

pursuant to 28 U.S.C. § 636(c).

**I.  PROCEDURAL HISTORY.**

   In October 2001, Asay filed an application for a period of disability and disability

insurance benefits under the Federal Old Age, Survivors and Disability Insurance Program

(OASDI), 42 U.S.C. § 401, *et seq*., alleging a disability onset date of March 5, 2001.  His claim

was denied, initially and upon reconsideration.  Asay requested a hearing before an administrative

law judge (ALJ), which was held on February 7, 2003.  TR. 29-47.  On March 21, 2003, the ALJ

determined that Asay was not disabled.

Thereafter, Asay requested review of the ALJ's decision by the Appeals Council, which was denied.  On August 31, 2004, this Court entered a judgment affirming the decision of the Commissioner denying Asay's claim for benefits.  *Asay v. Commissioner of Social Security*, Case No. 6:03-cv-1306-ORL-18DAB (M.D. Fla. Aug. 31, 2004) (doc. no. 22).  Asay did not appeal this judgment.

On May 13, 2003, Asay filed a separate application for a period of disability and disability insurance benefits under OASDI alleging a disability onset date of March 15, 2001.  TR. 103-05. It also appears that he filed an application under the Supplemental Security for the Aged, Blind and Disabled Program ("SSI"), 42 U.S.C. § 1381, *et seq.*  TR. 13.[1]  These applications were also denied, initially and upon reconsideration.

Asay requested a hearing, which was held before a different ALJ on January 30, 2004. Asay, who was represented by a non-attorney, testified at the hearing.  TR. 48-68.

After considering the testimony and medical evidence presented, the ALJ found that Asay was insured under OASDI through the date of the decision.  TR. 14.  He found that Asay had not engaged in substantial gainful activity since March 15, 2001, his disability onset date.  TR. at 14, 16.  The ALJ determined that the medical evidence indicated that Asay suffered from high blood pressure, morbid obesity, and degenerative joint disease (DJD).  TR 16.  The ALJ found that Asay's impairments were severe but that they did not meet or equal any of the impairments listed in the applicable social security regulations.  TR. 16-17.

---

[1]  The index to the transcript reflects that the SSI document was not available for inclusion.

The ALJ determined that Asay had the residual functional capacity (RFC) to perform medium work.[2]  TR. 17.  Specifically, the ALJ found that Asay was able to "stand and/or walk about 6 hours in an 8-hour workday, sit intermittently during the remaining time of the day; . . . lift and/or carry 50 pounds occasionally and 25 pounds frequently[,] . . . [and] frequently bend . . . [and] stoop."  TR. 26.

The ALJ further found that Asay's allegations regarding his limitations were generally credible, but not totally credible as to the extent of the limitations arising from his impairments.  TR.18, 28.  In particular, the ALJ noted that "there was evidence of any underlying impairment . . . that could reasonably be expected to cause the symptomatology alleged[,] . . . [but that] . . . these impairments did not limit [Asay's] performance of all work, including medium work, on a regular and sustained basis . . . ."  TR. 25.

The ALJ ultimately determined that Asay was able to return to his past relevant work as a senior substation technician as generally performed in the national economy.  TR. 27, 122-24, 174-79 (*Dictionary of Occupational Titles* job description).  Consequently, the ALJ concluded that Asay was not disabled.  TR. 28.  The ALJ issued his decision on September 30, 2004.

Asay requested review of the ALJ's decision by the Appeals Council.  TR. 8.  On June 27, 2005, the Appeals Council denied Asay's request for review.  TR. 3-5.  This appeal timely followed.  Doc. No. 1.

---

[2] Pursuant to 20 C.F.R. § 404.1567(c), medium work is defined as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds."  The regulation further provides that "[i]f someone can do medium work, we determine that he or she can also do sedentary and light work."  *Id*.

-3-

## II.      JURISDICTION.

The ALJ's decision became the final decision of the SSA once the Appeals Council denied

Asay's request for review.  *See Falge v. Apfel*, 150 F.3d 1320, 1322 (11th Cir. 1998); 20 C.F.R. §

404.981.  This Court has jurisdiction over the present appeal under 42 U.S.C. § 405(g), as

incorporated by reference in 42 U.S.C. § 1383(c)(3).

## III.     STATEMENT OF FACTS.

A.      *Asay's Testimony and Written Statements*.

Asay was born on December 11, 1942.  TR. 103.   He graduated from high school and

completed two years of college.  TR. 51.  He is 6'1" tall and weighed approximately 245 to 250

pounds at the time of his hearing in January 2004.  TR. 61.

Asay previously served in the United States Coast Guard as an electrician until 1966.  He

served in the reserves through 1970.  TR. 51-52.

Asay was employed as a senior sub-station technician for Seminole Electric Co-op (SEC)

from 1985 through December 1999.  TR. 53, 139.  During his tenure with SEC he was required to

climb towers, maintain wiring, and crawl into tanks.  He explained that this job required a lot of

climbing.  He was exposed to outdoor elements, such as rain, wind, and dust on a regular basis.

TR. 53-54.  This job required heavy lifting on occasion.  Specifically, Asay stated that he had to

lift equipment that weighed about fifty to one-hundred pounds, but that he usually had somebody

to help him.  TR. 54, 131-32, 139.    The job also required that he walk or stand seven hours a day,

sit two to three hours a day, and stoop, kneel, crouch, reach, and handle big and small objects.  TR.

132, 139.

Asay last worked as a sales associate for Home Depot in March or May of 2001.  TR. 52,

131.  Asay held this job for about ten months.  TR. 56.  In this job, he had to stand or walk for six

to seven hours, sit for one hour, climb, crouch and handle large objects occasionaly, and stoop,

kneel, and handle small objects frequently.  He was required to lift ten pounds frequently, and fifty

pounds occasionally.  TR. 120.  He was terminated after he began experiencing really bad

coughing spells and breathing difficulties and a doctor advised him not to work on the floor.  TR.

53, 57.

Asay explained that his breathing problems started when he was working at Home Depot.

TR. 56.  He indicated that the dust and chemicals at Home Depot may have caused his breathing

problems.  *Id*.  His condition began to improve after he left Home Depot.  TR. 58-59.  At the

January 2004 hearing, Asay reported that his coughing spells occurred three to four times a week

and lasted for approximately five minutes.  He also experienced breathing problems at night.  TR.

55-59. He used a C-Pap machine to help him breathe when lying down or sleeping.  TR. 57-58.

Asay testified that if he tried to walk up a flight of stairs he would be puffing by the time he

got to the top of the stairs.  TR. 58.  He needed to sit down and take a break after walking a city

block.  TR. 60.  He was able to sit for about half an hour without needing to move or get up.  TR.

65.  He was able to stand for about thirty minutes without needing to sit down.  He was able to lift

a bag of groceries.  *Id*.

Asay used an inhaler twice a day.  TR. 60.  He explained that the inhaler made it easier for

him to breathe.  TR. 61.  Asay reported that he had arthritis in his back that limited the amount of

time he could sit or stand.  TR. 65. He also complained of achy pain in his knees, neck and

Achilles tendon.  TR. 106.  Asay testified that his coughing and breathing problems were the only impairments that inhibited his ability to work.  *Id*.

On a typical day, Asay awoke in the morning and ate breakfast, after which he read the paper and watched televison until about noon.  TR. 62.  He stayed home for most of the day.  He occasionally walked over to see his grandchildren, who lived a block away.  TR. 62-63.  Sometimes he would take a nap in the afternoon.  Asay never did any cooking, and he did not perform any routine household chores, aside from clearing the table off and taking the dishes to the sink.  TR. 63.  Asay was able to take care of his grooming and personal hygiene needs.  TR. 66, 149.

Asay was able to drive.  He drove to the grocery store on occasion, but his wife did the shopping.  TR. 64.     He flew to California in November 2002.  TR. 34.

B.     *Medical Evidence*.

X-rays taken of Asay's right hip and thoracic spine in 2000 and 1998, respectively, revealed degenerative changes.  TR. 274-75.[3]

---

[3]     As previously discussed, Asay did not appeal the judgment entered by this Court in August 2004 affirming the decision of the Commissioner denying his claim for benefits in *Asay v. Commissioner of Social Security*, Case No. 6:03-cv-1306-ORL-18DAB (M.D. Fla. Aug. 31, 2004) (doc. no. 22).  Consequently, the ALJ's findings in that case, as set forth in the decision dated March 21, 2003, became binding on the parties through that date.  *Draper v. Sullivan*, 899 F.2d 1127 (11th Cir. 1990); *Fremd v. Barnhart*, 412 F. Supp. 2d 1245, 1249-50 (M.D. Ala. 2005).  Thus, as both parties concede, doc. no. 18 at 4 n.1; doc. no. 19 at 2, the issue before the Court in the present appeal is whether Asay became disabled as defined by the Social Security Act *after* March 21, 2003.  I provide a summary of the relevant evidence in the record of Asay's condition before March 22, 2003, for the sake of completeness.

Asay had a polysomnogram (Split-Night) sleep study performed in October 2001. Francisco Remy, M.D., who interpreted the test results, opined that Asay had severe obstructive sleep apnea[4]/hypopnea[5] syndrome and prescribed use of a C-Pap machine.  TR. 272-73.

Asay was treated by Thomas K. Velleff, M.D. from at least March through October 2002. TR. 190-209.  In May 2002, Asay complained of shortness of breath with exertion.  Dr. Velleff's notes reflect diagnoses of dyspnea[6], obesity, hypertension (HPTN) and gastroesophageal reflux disease (GERD), among other things.  TR. 209. Chest x-rays taken in April 2002 revealed pulmonary emphysematous changes.  TR. 199.

Asay was also treated by Tracy L. Burney, M.D., in 2002.  Dr. Burney's report of an examination of Asay on March 8, 2002, reflects that he had occasional shortness of breath, but no wheezing, asthma, or environmental allergies.  TR. 221.

In May 2003, Asay presented to Florida Hospital Deland with complaints of right knee, heel, and ankle pain following a motor vehicle accident in January 2003.  TR. 229, 231-33, 235-36, 238-40.  The attending physician diagnosed Asay with tendonitis and prescribed Lortab.  TR. 231, 235. An x-ray revealed arthritic changes in Asay's right ankle.  TR. 234.   Asay also received a splint for his ankle.  TR. 235.

---

[4] "Absence of breathing."  STEDMAN'S MEDICAL DICTIONARY 114 (26th ed. 1995) (STEDMAN'S).

[5] "Breathing that is shallower, and/or slower, than normal."  STEDMAN'S at 838.

[6] "Shortness of breath, a subjective difficulty or distress in breathing, usually associated with disease of the heart or lungs; occurs normally during intense physical exertion or at high altitude." STEDMAN'S at 535.

On May 5, 2003, Ajay K. Verma, M.D., noted that an examination of Asay's right ankle revealed a calcaneal plantar spur and talar neck spur. Dr. Verma's impression was arthritic changes of the ankle. TR. 234.

On July 5, 2003, Angela Alfaro, M.D., examined Asay at the request of the SSA. TR. 242-45. Asay complained that he was suffering from, among other things, chronic shortness of breath. Asay reported that he experienced coughing fits on a daily basis. Even mild exertion caused shortness of breath and he occasionally suffered from wheezing and chest tightness after coughing episodes. TR. 242.

Dr. Alfaro observed that Asay was 5' 10" and weighed 249 pounds. TR. 243. His blood pressure was 130/80. Dr. Alfaro noted that Asay ambulated well and that he "[g]ot on and off exam table and up and out of chair without any problems." *Id*. However, Dr. Alfaro reported that Asay exhibited an increased respiratory rate "when moving from chair to the exam table." TR. 245. Asay's lungs were clear to auscultation. TR. 244.

Dr. Alfaro reported that Asay exhibited no edema,[7] cyanosis,[8] clubbing, swelling or atrophy of muscles. His gait was normal and his grip strength was 5/5. Asay's fine and gross manipulation were intact and his motor strength was 5/5 in all extremities. TR. 244.

Dr. Alfaro's impression was that Asay had chronic dyspnea of unknown etiology. Dr. Alfaro opined that Asay could sit for thirty minutes with position changes, and stand for twenty to

---

[7] "An accumulation of an excessive amount of watery fluid in cells, tissues, or serous cavities." STEDMAN'S at 544 (26th ed. 1995).

[8] "A dark bluish or purplish coloration of the skin and mucous membrane due to deficient oxygenation of the blood . . . ." STEDMAN'S at 425.

thirty minutes with position changes.  He could walk about a block but might need rest periods to catch his breath.  He could lift about ten pounds.  Dr. Alfaro indicated that "patient needs further evaluation of his breathing difficulties before an exact limitation or comment on his ability can be made about the status of his respiratory difficulties."  TR. 245.

In August 2003, Dr. Alfaro administered several spirometric pulmonary function tests to Asay at the request of the SSA.[9]  TR. 246-50. Dr. Alfaro noted that Asay was unable to hold breath out for the FVC portion of the tests.  TR. 247.  Dr. Alfaro did not provide an assessment of the test results.

In September 2003, Asay was treated for neck pain at the Volusia County Health Department.  TR. 269, 282.  The assessment of the attending physician was chronic obstructive pulmonary disease (COPD), hypertension (HTN), and gastroesophageal reflux disease (GERD). TR. 269.

In November 2003, Asay was treated for shortness of breath and back pain at the Volusia County Health Department.  TR. 269.   He was prescribed Albuterol.  *Id.*

On March 26, 2004, D. Negrete, M.D., completed certain interrogatories submitted by the ALJ concerning Asay.  TR. 276-79.  Dr. Negrete noted that he had only seen Asay on one occasion in November 2003, and that he had treated Asay for COPD, HTN, and GERD.  TR. 276.  Dr.

---

[9] Spirometry measures the mechanical function of the lung, chest wall, and respiratory muscles by assessing the total volume of air exhaled from a full lung to an empty lung (residual volume). Spirometry is used to establish baseline lung function, evaluate dyspnea, detect pulmonary disease, monitor effects of therapies used to treat respiratory disease, evaluate respiratory impairment, evaluate operative risk, and perform surveillance for occupational-related lung disease.  *See* Raed A. Dweik, *Pulmonary Function Testing*, EMEDICINE, http://www.emedicine.com/med/topic2972.htm (last visited Aug. 28, 2006).

Negrete also noted that Asay suffered from obesity, which caused him to experience shortness of breath.  TR. 277.

On May 15, 2004, Ed Magee, M.D., examined Asay at the request of the SSA.  TR. 281-85.  Asay reported that the pain in his knee and ankle had improved, although he occasionally experienced stiffness in his left knee when the weather changed.  Dr. Magee noted that Asay's blood pressure was well controlled at home.  Asay complained that he experienced shortness of breath, especially with exertion, and that he suffered from frequent dry cough.  Asay also reported that he experienced wheezing on occasion.  TR. 281.

Dr. Magee noted that Asay had a history of sleep apnea.   He used a C-Pap machine at night, but he did not receive much benefit from it.  TR. 281-82.  Dr. Magee observed that Asay used Albuterol on occasion, but that it did not help with his shortness of breath.  TR. 282.  Asay reported that he could stand for about thirty minutes at a time and that he usually stood for about three to four hours in an eight-hour period during the day.  Asay also informed Dr. Magee that he could walk about half-a-block on level ground, sit for about half an hour at a time without difficulty, and lift ten pounds.  Dr. Magee noted that Asay was taking the following medications:  Diovan; Triamterene; Naprosyn; Ranitidine; and an Albuterol inhaler.  *Id*.

Dr. Magee observed that Asay was 5'10 1/2" tall and weighed 261 pounds.  His blood pressure was 130/70.  Dr. Magee noted that Asay ambulated well and did not have any difficulty getting on or off the exam table or up or out of a chair.  Dr. Magee observed that Asay was mildly tachypneic[10] when moving into the office from up and out of a chair and going back on the exam

---

[10]        "Rapid breathing."  STEDMAN'S at 1759.

table.  Asay's lungs were clear to auscultation.  He did not exhibit any wheezes, rales, or rhonchi.  TR. 283.

Asay's grip strength was normal and there was no evidence of muscular atrophy or limb deformity.  There was no paraspinal muscle tenderness, scoliosis, peripheral edema, cyanosis, or clubbing in his spine and extremities.  *Id.*  Asay had normal range of motion (ROM) in all of his extremities.  TR. 284.

Dr. Magee's impression was that Asay suffered from hypertension, dyspnea, and a non-specific soft tissue abdominal mass.  TR. 284.  Dr. Magee noted that certain pulmonary function tests attached to his report demonstrated that Asay did not have an obstructive pattern.  *Id.*[11]

Dr. Magee also prepared a Medical Source Statement concerning Asay's ability to do work-related physical activities.  TR. 288-92.  Dr. Magee opined that Asay did not have any exertional, postural, manipulative, or visual/communicative limitations.  TR. 288-90.  Dr. Magee opined that Asay should have limited exposure to the following environmental conditions due to his respiratory symptoms: temperature extremes; dust; humidity/wetness; fumes, odors, chemicals, and gases.  TR. 291.

C.     *Reviewing Professionals*.

On September 4, 2003, Keith R. Holden, M.D., reviewed Asay's records and prepared a physical RFC assessment at the request of the SSA.  TR. 251-58.  Dr. Holden opined that Asay

---

[11]     The tests appear to have been administered by Dr. Magee in May 2004.  TR. 286-87, 293.  Dr. Magee did not provide any discernable assessment of the test results, aside from his comment that Asay did not have an obstructive pattern.  TR. 284.

could frequently lift twenty-five pounds and occasionally lift fifty pounds.  He could stand or walk (with normal breaks) about six hours in an eight-hour workday.  He could sit for about six hours in an eight-hour workday.  His ability to push and/or pull was unlimited.  TR. 252.  Dr. Holden further opined that Asay did not have any postural, manipulative, visual, communicative, or environmental limitations.  TR. 253-55.  Dr. Holden noted that Asay's shortness of breath could be associated with obesity but that his lung exams and pulmonary function tests were normal.  He opined that the alleged severity of Asay's symptoms were "minimally credible."  TR. 256.

On September 26, 2003, Eric. C. Puestow, M.D., reviewed Asay's records and prepared a physical RFC assessment at the request of the SSA.  TR. 259-66.  Dr. Puestow's assessment of Asay's functional capacity was the same as that reached by Dr. Holden.

## IV.    STANDARD OF REVIEW.

To be entitled to disability benefits under OASDI or SSI, a claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A).  A "physical or mental impairment" under the terms of the Act is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3); 42 U.S.C. § 1382c(a)(3)(D). In a case seeking disability benefits under OASDI, the claimant also must show that he or she became disabled before his or her insured status expired in order to be entitled to disability benefits.  42 U.S.C. § 423(c)(1); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979).

Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry that must be followed in determining whether a claimant is entitled to benefits.  In sum, an ALJ must apply the following criteria, in sequence:

> (1) Is the claimant presently unemployed?
>
> (2) Is the claimant's impairment severe?
>
> (3) Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1?
>
> (4) Is the claimant unable to perform his or her former occupation?
>
> (5) Is the claimant unable to perform any other work within the economy?

20 C.F.R. § 404.1520(a)(4); 416.920(a)(4).  An affirmative answer to any of the above questions leads to either the next question, or, on steps three and five, to a finding of disability.  A negative answer leads to a finding of "not disabled."  *See, e.g., McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1987) (per curiam).

"The burden is primarily on the claimant to prove that he is disabled, and therefore entitled to receive Social Security disability benefits."  *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing 20 C.F.R. § 404.1512(a)).  However, "the burden temporarily shifts at step five to the Commissioner[,] . . . [who] must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform."  *Id*. at 1278 n.2 (citing *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999)).

A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206,

-13-

1210 (11th Cir. 2005), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

The SSA's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g); *Dyer*, 395 F.3d at 1210.  "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982)(internal quotations omitted).

The court "must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). Where the SSA's decision is supported by substantial evidence, the court will affirm, even if the court finds that the proof preponderates against the decision.  *Dyer*, 395 F.3d at 1210.  The court may not reweigh the evidence or substitute its own judgment.  *Id*.

While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims.  *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988).  Therefore, the court will reverse if the SSA incorrectly applied the law, or if the decision fails to provide the court with sufficient reasoning to determine that the SSA properly applied the law.  *Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1146 (11th Cir. 1991)).

**V.      ANALYSIS.**

Asay raises two issues on appeal.  First, Asay contends the ALJ's finding that his testimony about the limitations arising from his impairments was not totally credible is not supported by substantial evidence.  Next, Asay argues that the ALJ erred in determining that he had the RFC to perform medium work.  These are the only issues I will address.

A.      *Credibility Determination*.

As previously discussed, the ALJ determined that Asay's testimony about his condition was essentially credible, but that the evidence did not support Asay's testimony about the extent of the functional limitations arising from his impairments.  The ALJ concluded that Asay's impairments did not limit his ability to perform all work, including medium work, on a regular and sustained basis during the relevant time period.  *Id*.  The ALJ found that Asay's allegations regarding his limitations were not totally credible.  TR. 28.  Asay asserts that the ALJ erred by failing to "make accurate and specific findings" in support of this determination.  Doc. No. 18 at 10-11.

In this circuit, a claimant's assertion of disability through testimony of pain or other subjective symptoms is evaluated pursuant to a three-part standard.  This standard "'requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.'"  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (quoting *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir.1991)).

If proof of a disability is based upon subjective evidence and a credibility determination is

critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication

must be so clear as to amount to a specific credibility finding." *Foote*, 67 F.3d 1553, 1562 (11th

Cir. 1995) (internal quotation marks and citation omitted).  If the Commissioner discredits the

claimant's subjective testimony, "[s]he must articulate explicit and adequate reasons for doing so."

*Id.* at 1561-62.

Asay is correct that the ALJ could have provided more insight into the basis for his

determination that Asay's allegations regarding his limitations were not totally credible.  However,

the ALJ did note that Asay failed to introduce any evidence from a treating source indicating that

he was unable to perform medium work.  TR. 23.  The ALJ further noted that no treating physician

had ever placed any work-related restrictions on Asay.  *Id*.  Finally, the ALJ specifically discussed

Dr. Magee's opinion in his decision.  Dr. Magee, who examined Asay in May 2004, opined that

Asay's impairments did not result in any exertional, postural, manipulative, or

visual/communicative limitations.  TR. 288-90.  While Dr. Magee did note that Asay's

impairments resulted in certain environmental limitations, there is no objective evidence in the

record that these particular limitations impacted his ability to do the following: perform medium

work on a regular and sustained basis; or return to his past relevant work as a substation inspector.

Accordingly, I find that the ALJ's credibility finding is supported by substantial evidence

in this instance.  *See Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) ("[T]here is no rigid

requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as

the ALJ's decision, as was *not* the case here, is not a broad rejection which is not enough to enable

-16-

[the district court or this Court] to conclude that [the ALJ] considered [the claimant's] medical

condition as a whole." ) (internal quotation marks and citation omitted) (emphasis original).

      B.    *RFC Determination.*

      Asay further argues that the ALJ erred in determining that he had the RFC to perform

medium work.  Specifically, Asay maintains the ALJ did not provide any discernable basis for

disregarding Dr. Alfaro's findings concerning the limitations associated with his impairments.

      In explaining his conclusion, the ALJ wrote that he gave controlling weight to the opinion

of Asay's treating physicians "because they are well supported and not contradicted by other

evidence."  TR.  23.  The problem with this explanation is that the only opinions of treating

physicians in the record, and cited by the ALJ, related to the period before March 21, 2003, and

thus are only relevant for historical purposes in determining whether Asay was disabled on and

after March 22, 2003.

      The medical evidence of Asay's condition on and after March 22, 2003 is conflicting.  Dr.

Alfaro opined that Asay could lift no more than ten pounds, which would preclude him from

returning to his past relevant work.  The reviewing doctors opined that Asay could lift up to fifty

pounds occasionally.  Dr. Magee concluded that Asay had no restrictions on the ability to lift.

While that Commissioner posits several theories in support of the ALJ's decision to disregard Dr.

Alfaro's opinion, the Court may not affirm a decision simply because some basis might have

supported it, if the stated reasons are insufficient to sustain the Commissioner's decision.  *Owens*

*v. Heckler*, 748 F.2d 1511, 1516 (11th Cir. 1984); *see also Davis v. Barnhart*, 377 F. Supp. 2d

1160, 1164 (N.D. Ala. 2005) ("An ALJ is not free to base his decision on unstated reasons . . . .")

(citing *Marbury v. Sullivan*, 957 F.2d 837 (11th Cir. 1992)).  Rather, "[i]n assessing the medical evidence in this case, the ALJ was required to state with particularity the weight he gave the different medical opinions and the reasons therefor."  *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987).

While the ALJ was certainly entitled to reject Dr. Alfaro's opinion if the evidence supported a contrary finding, *Sharfarz*, 825 F.2d at 280, in this instance he failed to provide any discernable basis for discrediting Dr. Alfaro's findings concerning the limitations associated with Asay's impairments.  Put differently, the ALJ failed to state what weight, if any, he gave Dr. Alfaro's opinion and the reasons therefore.  *Id*. at 289.

Under these circumstances, it is necessary to reverse the Commissioner's denial of benefits to Asay and remand this matter so that ALJ can properly assess and assign the appropriate weight to Dr. Alfaro's opinion in order to provide this Court with a sufficient basis to review the decision. *See Owens*, 748 F.2d at 1516.

VI.    CONCLUSION.

For the reasons set forth herein, it is **ORDERED** that the decision of the Commissioner is

**REVERSED** and **REMANDED** for further proceedings consistent with the foregoing analysis.

The Clerk of Court is directed to issue a judgment consistent with this Order and, thereafter, to

close the file.

**DONE** and **ORDERED** in Orlando, Florida this 29th day of August, 2006.

*Karla R. Spaulding*
_____
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties